CITY OF BOSTON & others[1] *vs.* JOHN HANCOCK MUTUAL
LIFE INSURANCE CO.

No. 90-P-1534.

Suffolk. March 20, 1992. - September 20, 1993.

Present: ARMSTRONG, PORADA, & LAURENCE, JJ

*Insurance*, Rate setting, Health and accident. *Hospital*, Charges for services. *Contract*, Insurance. *Practice, Civil*, Summary judgment.

On a claim against a health insurer by the city of Boston, its board of health and hospitals, and the commissioner of its department of health and hospitals on behalf of a hospital seeking additional payment for services rendered, a judge properly allowed the defendant's motion for summary judgment where, in response to the defendant's showing, by way of depositions and affidavits, a plausible and coherent methodology by which it determined the "reasonable and customary charges" for certain ancillary services, the plaintiffs failed to demonstrate that there was a genuine issue of material fact either by showing another plausible and coherent method of calculation or, alternatively, by demonstrating that the defendant's method of calculating the charges was conceptually flawed. [320-323]

CIVIL ACTION commenced in the Superior Court Department on December 30, 1983.

A motion for summary judgment was heard by *George N. Hurd, Jr.*, J.

*William A. Horne* (*Joseph L. Tehan* with him) for the plaintiffs.

*Edward J. Duggan* (*Joseph H. Skerry, III*, with him) for the defendant.

ARMSTRONG, J. After the Supreme Judicial Court ruled, in *Boston* v. *Aetna Life Ins. Co.*, 399 Mass. 569 (1987), that the city's claims on behalf of Boston City Hospital (BCH)

_____

[1]Board of health and hospitals for the city of Boston and Boston's commissioner of health and hospitals.

against several group insurers for additional payments for services rendered after July 1, 1982, were to be governed not by their actual charges for services on file with the Rate Setting Commission, but rather by the terms of the respective insurance policies (*id.* at 579, 581-582), all of the insurers except John Hancock Mutual Life Ins. Co. (Hancock) entered into settlement agreements with BCH. Hancock, whose policies called for payment of "reasonable and customary charges. . . [, defining] such a charge as one which 'does not exceed the general level of charges being made by others of similar standing in the locality' in similar circumstances," 399 Mass. at 579, filed a motion for summary judgment supported by depositions and affidavits detailing the method by which it calculated (and paid) "reasonable and customary charges." The supporting material indicated that effective July 1, 1982, BCH, to take advantage of the fact that the State's Medicaid program paid for ancillary services at the rate charged, raised its rates for such services by a factor of five or more, thus enabling BCH, which had an unusually high percentage of bad-debt and free-care patients, to recoup by means of excessive charges for ancillary services its losses on nonpaying patients. In response Hancock calculated (from records of hospital charges on file with the Rate Setting Commission) the average charges of four other Boston teaching hospitals (University Hospital, New England Medical Center, Massachusetts General Hospital, and Brigham and Women's Hospital) for ten commonly rendered ancillary services (such as chest and other X-rays, EKGs, urinalyses, blood tests, brain and bone scans) and concluded that their charges, on the average, were 16.64 percent of BCH's. On this basis Hancock began paying, for ancillary services rendered to its insureds, twenty percent of the amount charged.[2]

---

[2]For per diem charges for inpatients, which had not been raised in price, Hancock continued paying the full amount of the charge. The outpatient visit charge had been tripled, from $100 to $300. By Hancock's calculation the four other Boston teaching hospitals named in the text charged 19.4 percent of that amount, but Hancock continued to pay Boston City Hospital $100 (or 33.3 percent of the BCH charge) so as not to effect an actual reduction.

Effective March 1, 1984, BCH reduced its ancillary charges by fifty percent, and in response, Hancock doubled its calculation of the reasonable and necessary charges to forty percent of BCH's actual charges.[3] As of July 1, 1984, BCH further reduced its charges, and Hancock, using the same methodology, started paying BCH seventy percent of the amounts charged for ancillary services.

As it was clear that BCH's charges during the periods in question were "substantially higher than in any other Massachusetts hospital," *Boston* v. *Aetna Life Ins. Co.*, 399 Mass. at 581, we agree with the judge that Hancock's showing of a plausible and coherent methodology by which it determined the "reasonable and customary charges" for ancillary services cast on BCH a burden either to demonstrate another plausible and coherent method of calculation that would result in higher figures for reasonable and customary charges than those paid by Hancock; or, alternatively, to show that Hancock's method of calculating reasonable and customary charges was conceptually flawed. *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 712-716 (1991). BCH could not sustain this burden by ritually intoning (as it does in the last analysis) that what is "reasonable and customary" is a question of fact, or by suggesting merely that there *could* be other methods of determining reasonable and customary charges that might result in higher figures, but without the specificity required for a response to an amply buttressed motion for summary judgment.

The judge properly rejected BCH's single affirmative effort to sustain that burden. BCH furnished, under the affidavit of its own counsel, portions of a privately commissioned study[4] of hospital charges showing comparisons for certain surgical procedures during the period October 1, 1984, to September

---

[3]That is to say, when BCH's charges for ancillary services were cut fifty percent, the comparable hospitals' average charges for the same services became 33.28 percent of BCH's charges. By paying forty percent of the BCH charge, Hancock was still paying BCH more than the comparable hospitals charged for the same services.

[4]Massachusetts Health Data Consortium Inc.'s "Comparative Prices for Massachusetts Hospitals."

30, 1985 (i.e., after Hancock had raised to seventy percent the amount it paid on BCH charges for ancillary services). Twenty procedures were selected for the study, and the charges compared were the hospital bills representing the aggregate of routine charges, special care charges, and ancillary charges in each hospital. The hospitals were compared on the basis of the median aggregate charge for patients undergoing the procedure at each hospital and the highest aggregate charge recorded in the period for the same procedure. The study indicated that, in the period October, 1984, through September, 1985, median charges at Boston-area (HSA 4, Subarea 1) hospitals, twenty of which were included in the study, averaged sixty-six percent of those at BCH for the same procedures.

The relevance of the study can be questioned for a number of reasons; on its face it compares total charges for procedures as contrasted with charges for ancillary services, which are alone at issue in this case.[5] Taken as relevant, however, it does nothing to impugn the substantial accuracy of Hancock's calculation. During the period of the study Hancock was paying BCH's routine charges at 100 percent and its ancillary charges at seventy percent.[6]

---

[5]Another reason is BCH's own view, contained as an appended comment in the study itself, that the data presented were misleading as applied to BCH: "We [i.e., BCH] believe the target population for your study limits too significantly the number of cases to be representative of Boston City Hospital, less than 1.8% of our patients for FY 1985. Further, 13 of the 20 procedures selected have less than 5 cases and 5 of the 20 no cases at all, with 85% of the cases restricted to diseases and disorders of the female reproductive system."

[6]The affidavit of BCH's counsel, to which the study was attached, emphasized that the high charges at other hospitals (i.e., the highest bill rendered by each hospital for a patient classified under the diagnostic related grouping system as being admitted for one of the twenty procedures) averaged eighty-eight percent of the high charges at BCH. The affidavit also states: "BCH has informed me that the level of payments received from Hancock falls far short of even the sixty-six [percent] level." The highest-bill data are simply irrelevant to determining reasonable and customary charges for particular ancillary services. The assertion that Hancock's payments fall short of the sixty-six percent level, apart from being too vague to consider for summary judgment purposes, must be disregarded for the technical reason that the affiant would not be competent to testify thereto.

On appeal BCH argues that BCH has a higher percentage of free-care, bad-debt patients than other hospitals included in the Hancock comparison — or, indeed, than any other Massachusetts hospital (see *Boston* v. *Aetna Life Ins. Co.,* 399 Mass. at 576) — and that Hancock's comparison may be flawed by reason of the fact (one which does not find support in the record but which we accept as true for purposes of decision) that bad-debt and free-care patients, by virtue of having had generally less satisfactory medical care than paying patients, are apt to be sicker entering the hospital and to require more expensive care than more affluent patients. This fact BCH attempts to tie to the extended definition of reasonable and customary charges in the Hancock policies: "the general level of charges being made by others of similar standing in the locality where the charge is incurred, when furnishing like or comparable treatment, services or supplies to individuals of the same sex and of comparable age and income, for a similar disease or injury." BCH's argument that its patients are of lower average income than patients at the comparison hospitals is irrelevant in the absence of a showing that either BCH or the comparison hospitals differentiate in their charges among persons of different income or age or sex. The contrary seems to be true. Clearly, the fact that a sicker patient may require more services or more days in the hospital, while related to total size of hospital bill, is logically unrelated to the charge per service, which is alone at issue in this case.

We have considered the other arguments advanced by BCH, and they are without merit.[7] The judge was correct in

---

Mass.R.Civ.P. 56(e), 365 Mass. 825 (1974). *Madsen* v. *Erwin,* 395 Mass. 715, 721 (1985). *Dattoli* v. *Hale Hosp.,* 400 Mass. 175, 178 (1987). *Whirty* v. *Lynch,* 27 Mass. App. Ct. 498, 500 (1989).

[7]For example, BCH argues (in two sentences) that Hancock, as the insurer, bore the burden of proving the application of an exclusion: that Hancock's obligation was to pay charges, subject to the exception that it would be relieved from paying charges as billed if it could prove that reasonable and customary charges were lower. BCH cites *Murray* v. *Continental Ins. Co.,* 313 Mass. 557, 562-563 (1943), as authority for shifting the burden of proof to Hancock. The policy pays for "covered expenses to the extent that the charges are reasonable and customary." This is not an

ruling that BCH failed to demonstrate that there was a genuine issue of material fact in response to Hancock's affidavits. *Community Natl. Bank* v. *Dawes*, 369 Mass. 550, 554 (1976). *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. at 712-716.

*Judgment affirmed.*

---

exclusion, and, if it were, Hancock met its burden when it demonstrated by affidavits how it computed the reasonable and customary charges for ancillary services. Responding to another BCH contention, that the principal Hancock affidavits should be struck, we have concluded that the studies represented by exhibits A and B are properly admissible as business records and that *Commonwealth* v. *Trainor*, 374 Mass. 796 (1978), is inapposite if only for the reason that the methodology in the Hancock survey is not deficient. *Id.* at 802-803.